925 A.2d 12

M.E.F., PLAINTIFF–APPELLANT, v. A.B.F.,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued telephonically March 7, 2007—Decided June 13, 2007.

544

Before Judges KESTIN, WEISSBARD and PAYNE.

*Mary Cay Trace* and *Donald B. Mark* argued the cause for appellant (*Trace & Jenkins* and *Donald B. Mark,* attorneys; *Erin L. Benson,* on the brief).

*Anthony J. Fiola,* Assistant County Counsel, argued the cause for respondent Gloucester County Division of Social Services (*Samuel J. Leon,* Gloucester County Counsel, attorney; *Maria Detitto,* on the brief).

*Caitlin A. McLaughlin,* Deputy Attorney General, argued the cause for respondent Division of Medical Assistance and Health Services (*Stuart Rabner,* Attorney General, *Michael J. Haas,* Assistant Attorney General, of counsel; *Ms. McLaughlin,* on the brief).

The opinion of the court was delivered by

PAYNE, J.A.D.

In this appeal, we are asked to construe provisions of the Medicaid Catastrophic Care Act of 1988 (MCCA or Act) and its state regulatory counterpart that, in situations in which a Medicaid-eligible spouse is institutionalized, provide a maintenance allowance for the support of the spouse who remains in the community. Specifically, we are asked to determine the mechanisms available to the "community spouse" to increase the amount of allocated support to be obtained from the "institutionalized spouse" and the level of proof required.

Medicaid is a jointly-funded, federal-state program that, among other things, provides medical assistance to needy persons who are institutionalized in nursing homes as the result of illness or other incapacity. Prior to 1988, the Medicaid eligibility criteria of the program required, in situations in which one spouse was institutionalized and needed Medicaid assistance to defray the cost of care and one remained in the community, that the couple "spend down" their assets and allocate what remained in a fashion that often impoverished community spouses (often wives) with few independent assets and little income. In order to remedy this circumstance, Congress passed the "spousal impoverishment provisions" of the Medicare Catastrophic Coverage Act of 1988, 42 *U.S.C.A.* § 1396r-5.

A component of the MCCA, set forth in 42 *U.S.C.A.* § 1396r-5(d), captioned "Protecting income for community spouse," provides that, in determining how much of the Medicaid-eligible institutionalized spouse's remaining monthly income is available to defray the costs of care, certain amounts first be deducted or

offset from that income. 42 *U.S.C.A.* § 1396r–5(d)(1). Among them is an amount designated as the community spouse's monthly income allowance. 42 *U.S.C.A.* § 1396r–5(d)(1)(B). That allowance, in turn, is the amount by which the community spouse's needs in the form of a minimum monthly maintenance needs allowance (MMMNA), established by each state in compliance with federal standards, exceeds the community spouse's income. 42 *U.S.C.A.* § 1396r–5(d)(2) and (3). A cap on the amount of the MMMNA is established by 42 *U.S.C.A.* § 1396r–5(d)(3)(C).

Within paragraph (d) is a further provision relating to deductions from the institutionalized spouse's monthly income which states:

(5) Court ordered support

If a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the community spouse monthly income allowance for the spouse shall not be less than the amount of the monthly income so ordered.

[42 *U.S.C.A.* § 1396r–5(d)(5).]

This "court ordered support" provision within paragraph (d) is immediately followed by paragraph (e), which establishes a fair hearing mechanism for use in contesting the amount of the community spouse's MMMNA, stating in 42 *U.S.C.A.* § 1396r–5(e)(2)(B):

If either … spouse establishes that the community spouse needs income, above the level otherwise provided by the minimum monthly maintenance needs allowance, due to exceptional circumstances resulting in significant financial duress, there shall be substituted, for the minimum monthly maintenance needs allowance … an amount adequate to provide such additional income as is necessary.

In New Jersey, the statutory provisions implementing Medicaid are set forth in the Medical Assistance and Health Services Act, *N.J.S.A.* 30:4D–1 to –42. Pursuant to that statute, the Division of Medical Assistance and Health Services (Division), within the Department of Human Services, is vested with the authority to administer Medicaid. *N.J.S.A.* 30:4D–7; *see also* 42 *U.S.C.A.* 1396a(a)(5) (requiring states participating in Medicaid to establish or designate a single state agency to administer or supervise the plan). In accordance with its designated authority, the Division has promulgated regulations implementing the MCCA. *N.J.A.C.*

10:49–1.1 *et seq.* Regulations governing eligibility determinations, resource allocations and income distribution are set forth at *N.J.A.C.* 10:71–4.1 to –5.9. Provisions for the establishment of the MMMNA and a fair hearing mechanism for its review are set forth at *N.J.A.C.* 10:71–5.7. A regulation providing precedence to court ordered support, similar to 42 *U.S.C.A.* § 1396r–5(d)(5), appears at *N.J.A.C.* 10:71–5.7(f).[1]

The wording of the State regulations differs somewhat from that of the MCCA. However, we have previously determined, when discussing Medicaid regulations concerning resource allocation, that the New Jersey regulations "essentially track the federal statute." *A.K. v. Div. of Med. Assistance,* 350 *N.J.Super.* 175, 180, 794 *A.*2d 835 (App.Div.2002). As in *A.K.,* no argument suggests that the state regulations are not "consistent with and reflective of the federal statute." *Id.* at 181, 794 *A.*2d 835. We note, however, that the standard for an increase in the MMMNA pursuant to federal statute requires proof of "exceptional circumstances resulting in significant financial duress," 42 *U.S.C.A.* § 1396r–5(e)(2), whereas New Jersey regulations require proof of "exceptional circumstances resulting in financial duress." *N.J.A.C.* 10:71–5.7(e). Nonetheless, because of the close parallels between federal law and state regulation, and the absence of any evidence that New Jersey sought to diverge from the MCCA model, our analysis will focus in large measure on the federal statute and its history.

The relationship between the "court ordered support" and "fair hearing" provisions of the MCCA in determining the MMMNA of a community spouse who seeks an upward modification of the allowance provided by the state forms the focus of this appeal.

---

[1] That regulation states:

> If a court has entered an order against an institutionalized spouse for monthly income for the support of a community spouse and the amount of the order is greater than the amount of the community spouse deduction, the amount so ordered shall be used in place of the community spouse deduction.

The issue presented arises in the following fashion: M.E.F.'s husband, A.B.F., who was seventy-five years of age when this matter began, is confined to a nursing home with Alzheimer's disease and other ailments. After spending down his assets, he qualified as a medically needy person for payment of his nursing home expenses by Medicaid.

Upon becoming Medicaid-eligible, A.B.F. retained an income of $2,333 per month, derived from $1,185 in social security payments and $1,148 in pension payments. His wife, M.E.F., received $576 per month from Social Security as her sole source of independent income—an amount that was clearly inadequate for her support.

As we have noted, as a protection against spousal impoverishment, M.E.F., as a community spouse, was statutorily entitled to a MMMNA under guidelines established by the State pursuant to Federal law. After M.E.F.'s income was subtracted from that MMMNA, the remainder, the community spouse monthly income allowance, would be deducted from A.B.F.'s remaining income and paid to M.E.F.

As statutorily required, upon affirmatively determining Medicaid eligibility pursuant to the State's "medically needy" program, and receiving notice of M.E.F.'s status as a community spouse,[2] in June 2004, respondent Gloucester County Board of Social Services (the Board), the county entity to which the authority to conduct Medicaid eligibility determinations has been given, *N.J.S.A.* 30:4D–7a, allocated approximately $445 of defendant's monthly income to M.E.F. to be used as a maintenance allowance.

On May 31, 2005 M.E.F. instituted an action in the Family Part for separate maintenance, pursuant to *N.J.S.A.* 2A:34–24, and

---

[2] The record does not establish whether, upon qualification for Medicaid, the MMMNA is automatically calculated, or whether it is generated only after a request by the community spouse. This question may be significant in determining the extent to which the community spouse has availed him or herself of the administrative process. It is less relevant in the present case, because the process advanced further.

moved for an order summarily granting that relief. As relief, she sought an order providing her "with separate maintenance in an amount equal to [A.B.F.'s] remaining net income." M.E.F. claimed that A.B.F. had no need of the funds, since the costs of his medical care were being paid by the State. M.E.F.'s motion was denied without prejudice by the court on June 24, 2005, as the result of lack of factual support and procedural inadequacies.

Alleging that her MMMNA was inadequate to meet her needs, M.E.F. also sought its upwards adjustment through an application to the Board for re-determination. On June 29, 2005, the Board granted M.E.F.'s request and raised her share of defendant's income to $1,173 per month,[3] leaving A.B.F., after further statutory deductions, with an income of $957, which was paid to the nursing home as partial payment for the expenses of his care. Medicaid paid the rest.

Although M.E.F. continued to maintain that her allowance was inadequate, she did not pursue the statutorily-available administrative remedy of a fair hearing, *N.J.A.C.* 10:71–5.7(e) and *N.J.A.C.* 10:71–8.4, followed by a direct appeal to us from the Board's decision, but instead, in September 2005, she renewed her motion for separate maintenance in the Family Part, providing notice to the Board of her application, as required by the court in its decision on M.E.F.'s prior motion.

A hearing was held in the Family Part in which M.E.F. and the Board participated. At that hearing, M.E.F. argued that the MCCA and New Jersey administrative regulations allowed a community spouse, seeking an increased maintenance needs allowance, to choose either an administrative route or a path through the Family Part. M.E.F. further argued that the burden placed upon the community spouse differed depending on the choice of forum, and that Congress intentionally created this disparity to benefit the community spouse. Whereas her burden in an adminis-

---

[3] M.E.K. asserts that the cap in 2005 was $1,604.

trative proceeding would have been to establish "exceptional circumstances resulting in financial duress," *N.J.A.C.* 10:71–5.7(e), in the Family Part, her application would be determined under the standards set forth in *N.J.S.A.* 2A:34–23, which includes consideration of actual need and the ability of the parties to pay, the duration of the marriage, the standard of living established in the marriage, and other enumerated factors. *See also N.J.S.A.* 2A:34–24 (incorporating standards of *N.J.S.A.* 2A:34–23 into orders for support and separate maintenance).

The Board argued that M.E.F.'s reading of the statute was incorrect, and it asserted that the federal statute referencing judicial awards of support to community spouses, 42 *U.S.C.A.* § 1396r–5(d)(5), and its state regulatory counterpart, *N.J.A.C.* 10:71–5.7(f), were meant to refer only to orders entered before institutionalization. It contended, alternatively, that M.E.F. must exhaust her administrative remedies before seeking an adjustment to the MMMNA in the Family Part, and that M.E.F.'s reading of the statute encouraged parallel litigation and forum shopping.

Following the hearing, the judge issued a written opinion denying M.E.F.'s claim. The judge determined that the MCCA's provisions regarding court orders of support applied only to orders already in existence. Because no order had been previously entered in M.E.F.'s favor, the statute requiring an administrative agency to honor such orders was inapplicable. Furthermore, the judge held that, having begun the administrative process, M.E.F. was required to exhaust her administrative remedies "to ensure uniformity procedurally and also to discourage forum shopping." And the judge suggested that federal procedures requiring an administrative hearing, in circumstances such as those facing M.E.F. while the administrative proceeding pended, preempted her right to an independent state court determination of support.

## I.

On appeal, M.E.F. presents the same arguments raised before the Family Part judge, arguing that the MCCA and State adminis-

trative regulations provide for alternate avenues to challenge an agency's determination of a community spouse's monthly income allotment, with differing standards to be applied by the adjudicatory body depending upon the forum in which the review is sought. Prior to oral argument, we requested that the Division address the issue of whether *N.J.A.C.* 10:71–5.7(f) requires a showing of exceptional circumstances for an increase in the community spousal allowance, and we have the benefit of its arguments on that issue, as well as the arguments of the Board.

The Division concedes that the Act provides alternative routes for obtaining an increased MMMNA. However, it additionally argues that the "exceptional circumstances" standard applies to each proceeding. The Board contends that, having commenced the administrative process required for an increase in her MMMNA by obtaining an initial calculation by the Board and then seeking an increase, M.E.F. is limited to an administrative forum, and has not exhausted her remedies in that forum. The Board argues further that M.E.F. is precluded from obtaining relief in the Family Part when she did not obtain her original remedy in that forum.

## II.

Because neither the wording of the MCCA nor that of New Jersey's substantially similar regulations resolves the issues raised in this appeal, that resolution requires an examination of the Act's legislative history. *Ramapo River Reserve v. Oakland,* 186 *N.J.* 439, 450, 896 *A.*2d 459 (2006) (quoting *DiProspero v. Penn,* 183 *N.J.* 477, 492–93, 874 *A.*2d 1039 (2005)). That history is set forth, in relevant part, in the Report of the House Committee on Energy and Commerce on H.R. 2470, introduced as an amendment to title XVIII of the Social Security Act, House Report No. 100–105(II), *reprinted in* 1988 *U.S.C.C.A.N.* 857 (1987). In discussing provisions of the amendment addressing the protection of income and resources of a couple for maintenance of the community spouse, the Committee stated:

Medicaid, a means-tested entitlement program, requires that the elderly or disabled nursing home resident be poor in order to qualify for coverage. It also limits the income that an institutionalized spouse may make available for the spouse remaining in the community. If the institutionalized spouse receives the pension and other income in his name, this limit may have the effect of impoverishing the spouse in the community. The purpose of the Committee bill is to end this pauperization by assuring that the community spouse has a sufficient—but not excessive—amount of income and resources available to her while her spouse is in a nursing home at Medicaid expense. This will be of particular benefit to older women, who, in the current generation at risk of nursing home care, have often worked at home all their lives raising families and have limited income other than their husbands' pension checks.

[*Id.* at 65; 1988 *U.S.C.C.A.N.* at 888.]

The Committee then explained that, under current law, once Medicaid eligibility had been established by meeting applicable income and resource standards, some of an institutionalized spouse's income would be reserved for the use of the two spouses and their family, and the remainder would be applied to the cost of nursing home care. *Id.* at 67; 1988 *U.S.C.C.A.N.* at 890. Although an allowance for the maintenance needs of the community spouse was already statutorily provided, then-existing regulations placed a low floor on its amount, which varied widely from state to state. The Committee observed, in a paragraph entitled "Court-ordered support":

In some cases, courts have issued orders against institutionalized spouses requiring them to make monthly support payments in certain amounts to their spouses in the community. The policy of the Health Care Financing Administration (HCFA) is that, notwithstanding such an order, the income of the institutionalized spouse is to be considered available to him for purposes of determining the amount of his contribution toward the cost of nursing home care. The only part of his income which HCFA policy acknowledges as available to the community spouse is the specified maintenance needs allowance.

[*Id.* at 69; 1988 *U.S.C.C.A.N.* at 892.]

Turning to the proposed bill, the Committee observed that current maintenance needs levels for community spouses were "inadequate" and that "[i]n some cases, they have forced community spouses, in desperation, to sue their husbands for support." *Ibid.* The Committee declared that its bill "would end spousal impoverishment" and "assure that the community spouse in these circumstances has income and resources sufficient to live with

independence and dignity." *Ibid.* Specifically, the Committee proposed that, after an institutionalized spouse had met the resource and income criteria for Medicaid eligibility, the income attributed to that spouse would be reserved first for that spouse's personal needs, second for the community spouse's monthly income allowance, and third for the needs of dependents.[4] The remainder would be applied to incurred medical expenses. *Id.* at 71–72; 1988 *U.S.C.C.A.N.* at 894–95.

The community spouse's monthly income allowance would be set at a level sufficient to bring the community spouse's income up to a specified level considerably in excess of the poverty line, and the amount that could be deducted from the institutionalized spouse's income would be capped at $1,500 per month, a figure that would be increased at an indexed rate. *Id.* at 72; 1988 *U.S.C.C.A.N.* at 895. However, the Committee continued:

> The $1500 limit on the minimum monthly maintenance needs allowance is not absolute. Under the bill, the institutionalized spouse is entitled to an opportunity to demonstrate, at a fair hearing, that the minimum monthly maintenance needs allowance is inadequate to support the community spouse without financial duress. If the spouse makes this showing, by a preponderance of the evidence, the State would be required to establish an adequate monthly maintenance needs allowance in that case.
>
> [*Ibid.*]

Notably, the then-existing statute did not contain a fair-hearing procedure.

Following this statement, the Committee again made reference to "Court ordered support," stating:

> The Committee recognizes that there will be some instances in which the rules set forth in the bill do not take adequate account of the special circumstances affecting a particular community spouse. The bill therefore provides that, if a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the community spouse monthly income allowance must be at least as great as the amount of the income ordered to be paid. Similarly, if a court has entered a support order against an institutionalized spouse requiring that spouse to transfer countable resources to the community spouse, the

---

[4] An additional amount could be utilized to pay outstanding medical bills for which no third-party payor existed.

spouse may comply with the court's order without running afoul of the transfer of assets prohibitions, even where the effect is to leave the community spouse with countable resources in excess of $48,000.
[*Id.* at 72–73; 1988 *U.S.C.C.A.N.* at 895–96.]

No specific statement regarding the circumstances in which court ordered support could be utilized in lieu of a MMMNA exists in the Committee's Report, or in the Act, as passed. Further, neither legislative history nor the statute addresses the standard of proof applicable in court proceedings.

The language of 42 *U.S.C.A.* § 1396r(d)(5) suggests, by the use of the past tense in the court ordered support provisions ("[i]f the court *has entered* an order against an institutionalized spouse"), that a community spouse such as M.E.F. cannot, at this point, seek such an order, not having previously obtained one. Indeed, a strong argument can be made that the court ordered support provision is applicable only when such support has been obtained during spend-down and prior to a determination of Medicaid eligibility. Such an interpretation would be consistent with a Congressional concern, expressed in the context of a discussion of the treatment of income, protection of income for the community spouse, and transfer of resources, that spouses not be worse off under proposed legislation than they were under existing law, which in some instances recognized spousal support orders. House Report No. 100–105(II) at 69; 1988 *U.S.C.C.A.N.* at 892; *see also* 133 *Cong. Rec.* E 1278 (April 6, 1987) (reporting Representative Waxman as stating in regard to the spousal impoverishment provisions of H.R. 1711, introduced by him and Representative Schumer, that provisions exist "to assure that no beneficiary would be inadvertently disadvantaged by these new rules," by allowing an institutionalized individual to elect to be governed by prior rules governing eligibility and post-eligibility if more favorable).

Further, as the Division argues, the absence of an administrative remedy to address inadequacies in the level of a spouse's MMMNA, prior to the passage of the Act, meant that a community spouse seeking to avoid impoverishment was required to obtain

a court order of support. Recognizing the need to avoid re-litigation of these issues and the potential harm to pre-existing community spouses, Congress intended to protect such orders, while providing a new fair-hearing remedy going forward. Under this interpretation, Congress did not intend to provide alternative remedies, but merely to preserve existing rights.

This interpretation is also consistent with the language of 42 *U.S.C.A.* § 1396r–5d, which in essence provides that, "[a]fter an institutionalized spouse is determined ... to be eligible for medi-cal assistance," in determining the amount of that spouse's income to be applied to the costs of care, a deduction shall be recognized for the community spouse's monthly income allowance (as subject to modifications through the fair hearing process), except "[i]f a court has entered" a support order, in which case the court order has preemptive effect.[5]

It is noteworthy that the Act does not authorize the community spouse to obtain a court order after eligibility has been deter-mined, nor does it explicitly permit parallel proceedings. It merely recognizes the effect of an order of support if it has been previously obtained.

However, courts have not recognized court orders only in this narrow context. In particular, in *H.K. v. Div. of Med. Assistance and Health Servs.*, 379 *N.J.Super.* 321, 325, 878 *A.*2d 16 (App.Div.), *certif. denied,* 185 *N.J.* 393, 886 *A.*2d 663 (2005), we characterized the court-ordered support provisions of *N.J.S.A.* 10:71–5.7(f) as providing an alternative means of obtaining support for the community spouse. *See also, Gomprecht v. Gomprecht,* [6] 86 *N.Y.*2d 47, 629 *N.Y.S.*2d 190, 652 *N.E.*2d 936 (1995). Other

---

[5] A similar "court order" provision exists in connection with the transfer of resources for the support of the spouse or family member. 42 *U.S.C.A.* 1396r–5(f)(3). Such a provision is clearly applicable to the initial calculation of Medicaid eligibility and whether a penalty should be imposed as the result of a resource transfer during the look-back period.

[6] This decision is also referred to as *Gomprecht v. Sabol.*

unreported decisions consistently take this position.[7] Further, the Division does not adopt the restrictive interpretation that we have discussed and that the Family Part judge adopted, but instead in this appeal has described the statutory scheme as providing two avenues for relief and has simply argued that the same standard of proof should apply to both. An administrative agency's interpretation of its own regulations is entitled to our deference. *W.T. v. Div. of Med. Assistance and Health Servs.*, 391 *N.J.Super.* 25, 36, 916 *A.*2d 1066 (App.Div.2007); *H.K., supra*, 379 *N.J.Super.* at 327, 878 *A.*2d 16.

An interpretation of the Act as providing roughly parallel means for establishing a community spouse's maintenance allowance is arguably consonant with legislative history recognizing that "there will be some instances in which the rules set forth in [the proposed legislation] do not take adequate account of the special circumstances affecting a particular community spouse." House Report No. 100–105(II) at 72; 1988 *U.S.C.C.A.N.* at 895.[8] Further it is

---

[7] We cite those opinions for informational purposes only as the following: *In re Estate of Elwood Tyler*, 2002 WL 1274125 (D.C.Super.2002) (LEXIS cite unavailable); *Blumberg v. Tenn. Dept. of Human Servs.*, 2000 WL 1586454, 2000 *Tenn.App. LEXIS* 709 (2000); *see also Jenkins v. Fields*, 1996 WL 221614, 1996 *U.S. Dist. LEXIS* 5852 (S.D.N.Y.1996)

[8] However, even here, it can be argued that "special circumstances," an undefined term, was merely meant to encompass the situation in which a prior order of support has been entered. Such an interpretation accords with the description of the amendment to the Omnibus Budget Reconciliation Act of 1986, introduced by Representative Mikulski in an early effort to address the issue of community spousal impoverishment. There, she states that her bill would

> require state Medicaid agencies to recognize court ordered support plans *as exemptions in determining Medicaid eligibility*. Individuals now can have their unique financial circumstances reviewed on a case by case basis in state court to determine the institutionalized spouse's financial responsibility to the community spouse. In this way, special circumstances can be accounted for that might otherwise not be foreseen by federal regulations. Under my legislation, state Medicaid agencies would be required to recognize such support orders.
>
> [132 *Cong. Rec.* H 11437 (October 17, 1986) (emphasis supplied).]

reasonable to suggest that Congress—which expressed a purpose to foreclose HCFA from declining to recognize court orders of support entered to supplement the income of spouses whose MMMNAs were, under prior law, manifestly inadequate—intended to preserve this avenue of relief in those circumstances in which, even under the more generous standards of current legislation, a community spouse's MMMNA, as calculated pursuant to regulation, remained insufficient. Additionally, recognition of dual means for increasing the monthly income allowance of a community spouse would be consistent with Congress's deference to state standards for support, except when federally preempted.

In any event, the present appeal does not require our decisive construction of the effect of the court ordered support provision, because we are satisfied that, in the present case, M.E.F.'s effort to obtain such an order, perfected only after her MMMNA had been reconsidered and increased, albeit not to her satisfaction, constituted parallel litigation and a form of forum shopping of a sort that we are unwilling to recognize as valid. *See Wilson v. Wal–Mart Stores*, 158 *N.J.* 263, 270, 729 *A.2d* 1006 (1999); *Aldrich v. Manpower Temp. Servs.*, 277 *N.J.Super.* 500, 504, 650 *A.2d* 4 (App.Div.1994), *certif. denied*, 139 *N.J.* 442, 655 *A.2d* 445 (1995).

In this connection, we agree that the standards applicable to an award of support in an action for separate maintenance differ from those applicable in the fair hearing context of 42 *U.S.C.A.* § 1396r–5(e)(2)(B), discerning no basis in the language of the Act or New Jersey regulations for the application of the more stringent standard in the context of a Family Part proceeding. *DiProspero, supra*, 183 *N.J.* at 492, 874 *A.2d* 1039; *L.M. v. State of N.J., Div. of Med. Assistance and Health Servs.*, 140 *N.J.* 480, 498–99, 659 *A.2d* 450 (1995); *W.T., supra*, 391 *N.J.Super.* at 41, 916 *A.2d* 1066.

An award of support entered against an institutionalized spouse prior to Medicaid eligibility would clearly be governed by the standards articulated in *N.J.S.A.* 2A:34–23. We see no principled

reason why those standards would change simply because the spouse was found to be eligible for Medicaid and subject to the spousal income protection provisions of the Act.[9] We do note, however, that the standards for calculating support, set forth in *N.J.S.A.* 2A:34–23, permit consideration of spousal "actual need," ability to pay, and "[a]ny other factors which the court may deem relevant." *N.J.S.A.* 2A:34–23b(1) and (13). The dual purposes of the MCCA—to ensure that the community spouse has sufficient, but not excessive, income and to ensure that individuals not be permitted to avoid payment of their own fair share for long-term care—are certainly relevant considerations in this regard.

We decline, however, to adopt the position of the New York Court of Appeals in *Gomprecht, supra,* that individuals seeking a post-eligibility increase in monthly support through an action in the Family Court are not entitled to an award greater than that permitted by regulations requiring that exceptional circumstances and financial duress be demonstrated. 629 *N.Y.S.*2d 190, 652 *N.E.*2d at 938. We read *N.J.S.A.* 2A:34–23 as offering more discretion to the Family Part judge than does comparable New York law, even if the court decision serves to decrease assets otherwise available to the institutionalized spouse for payment of medical costs.

Our courts have recognized the legitimacy of Medicaid spend-down plans as a means of apportioning assets in order to achieve Medicaid eligibility, even if, by the use of such plans, the funds reserved for public purposes are decreased. *H.K. v. State of N.J., Dept. of Human Servs., Div. of Med. Assistance and Health Servs.,* 184 *N.J.* 367, 378–80, 877 *A.*2d 1218 (2005) (timely transfer of property, even if done to achieve Medicaid eligibility status, is permissible); *In re Keri,* 181 *N.J.* 50, 63, 69, 853 *A.*2d 909 (2004); *W.T., supra,* 391 *N.J.Super.* at 38, 916 *A.*2d 1066. However, no

---

[9] Other states have specifically incorporated the fair hearing standard into state family law. *See, e.g., Nev.Rev.Stat. Ann.* § 123.259(4); *Va.Code Ann.* § 20–88.02:1.

decision has permitted invocation of the potentially more liberal standards of *N.J.S.A.* 2A:34–23, in a parallel proceeding after Medicaid eligibility has been achieved, merely because a community spouse is dissatisfied with the administrative remedy that has been afforded to her and chooses not to confront the exceptional circumstances and financial duress requirements for relief that a fair hearing would demand. Neither the MCCA nor New Jersey regulations permit such forum shopping.[10] Indeed, were it permitted, the remedy of a fair hearing would become meaningless, a result that we declined to permit in *H.K., supra*, 379 *N.J.Super.* at 328, 878 *A.*2d 16.

It may well be, in such matters generally, that a trial court faced with a situation of this type would be well-advised to stay its hand, in recognition of the State agency's primary jurisdiction, until a determination of the community spouse's rights under federal/State Medicaid standards can be made; and only then to determine the rights of the spouses under State law alone. *Abbott v. Burke*, 100 *N.J.* 269, 297–300, 495 *A.*2d 376 (1985) (*Abbott I* ). We leave the choice whether to do so in individual cases to the sound discretion of the trial courts.

In sum, we are satisfied that, having embarked upon the administrative path by receiving and challenging the MMMNA provided to her, M.E.F. is limited to that path until a final administrative determination has been reached. We therefore affirm the decision of the trial judge dismissing M.E.F.'s action for support, without prejudice, because of her failure to exhaust her remedies under the path she initially elected.

Affirmed.

---

[10] Whether the New Jersey Legislature has sought in the past to provide alternative forms of relief, it has done so expressly, *see, e.g., N.J.S.A.* 10:5–13 and 27, pertaining to the Law Against Discrimination, and it has specified the circumstances in which alternative forums can be utilized. The MCCA contains no such provisions, nor do New Jersey's regulations.